Filed 2/17/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT
DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071681 |
| v. | (Super.Ct.No. FSB17002517) |
| TRAVON RASHAD VENABLE, SR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Ronald M. Christianson, Steve Malone, and Michael A. Smith*, Judges.[1] Reversed with directions.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Steve Oetting, Christopher Beesley and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

---

[1] Judge Christianson and Judge Malone granted continuances of the trial, which Venable argued violated his right to a speedy trial. Judge Smith presided over the trial and made the other rulings Venable challenged.

*Retired judge of the San Bernardino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Bullets fired from a small white car killed one victim and wounded another. Both victims were members or associates of the Westside Projects (Projects) gang. Months later, when the police arrested a known informant for an unrelated offense, he offered to give them information about the shooting. He told the police—and eventually testified—defendant and appellant Travon Rashad Venable, Sr. drove the car used in the shooting and Elgin Johnson was the shooter. Both Venable and Johnson were members of the California Gardens Crips (California Gardens) gang, a rival of the Projects.

A jury found Venable guilty of first degree murder (Pen. Code, § 187, unlabeled statutory citations refer to this code) and attempted murder (§§ 187, 664, subd. (a)).[2] The jury also found true, on each count, a gang enhancement (§ 186.22, subd. (b)) and a gang-related firearm enhancement (§ 12022.53, subds. (d), (e)). In a bifurcated proceeding, after defendant waived a jury trial, the judge found Venable had one prior serious felony conviction (§ 667, subd. (a)) and one "strike" prior (§§ 667, subds. (b)-(i), 1170.12). The judge sentenced Venable to a total of 129 years to life.

On appeal, Venable argued:

(1) The trial judge violated his speedy trial rights by repeatedly continuing the trial to accommodate counsel for his then-codefendant Johnson.

(2) The trial judge erred by admitting a rap video in which Venable appeared.

---

[2] The trial judge granted a motion for acquittal (§ 1118.1) on a count alleging unlawful possession of a firearm (§ 29800, subd. (a)(1)).

(3) The trial judge erred by giving CALCRIM No. 315, which required the jury to consider a witness's level of certainty when evaluating an identification by that witness.

(4) The jury found Venable guilty of attempted murder, not willful, deliberate, and premeditated attempted murder. The People conceded this point.

(5) The trial judge erred by sentencing Venable on both the firearm enhancements and the gang enhancements. The People conceded this point.

(6) Venable is entitled to a remand so the trial judge can consider striking the prior serious felony conviction enhancement under newly enacted legislation. The People conceded this point.

(7) Venable is entitled to a retrial for the gang allegations to be tried separately under newly enacted legislation.

(8) The gang enhancements and the gang-related firearm enhancements must be reversed because the jury was not instructed in accordance with newly enacted legislation. The People conceded this point.

(9) Venable is entitled to a remand for the trial judge to consider reducing the firearm enhancements under newly enacted legislation. The People conceded this point.

We initially found no errors other than those conceded by the People. (*People v. Venable* (Aug. 22, 2022, E071681) [nonpub. opn].) However, the Supreme Court granted review, transferred the matter back to us, and directed us to vacate our opinion and reconsider the cause in light of the newly effective Evidence Code section 352.2, enacted by Assembly Bill No. 2799 (Stats. 2022, ch. 973) (AB 2799).

Evidence Code section 352.2 requires trial judges to consider specific factors before admitting evidence of a form of creative expression—which explicitly includes rap—in a criminal proceeding to avoid injecting racial bias and improper consideration of criminal propensity. It's uncontested the trial judge did not consider those additional factors before admitting a rap video in Venable's trial and that the trial, as a result, didn't comply with the new requirements for admission. The question is whether these new requirements apply retroactively to cases like Venable's, which are pending on appeal at the time of their enactment. (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) We conclude the requirements of Evidence Code section 352.2 *do* apply retroactively in nonfinal cases and that their application likely would have influenced the trial in Venable's favor. We will therefore reverse the judgment and remand for a new trial.

Our conclusion moots the other bases of Venable's appeal.

# I

## FACTS

### A. *Witness Accounts*

The surviving victim, Kiyon "Kiki" Drake, testified at trial. Drake admitted he "sometimes h[u]ng out with" members of the Projects. On March 5, 2014, around 12:15 p.m., Drake and his friend Enon "Bubba" Edwards were at the intersection of Medical Center Drive and Union Street in San Bernardino. As they were crossing the street, someone in a small, older white car going north on Medical Center started shooting at them and they "took off running."

A bullet hit Drake in the back and came out through his chest. After he rounded a building, he looked back and saw Edwards lying on the ground. Drake suffered a collapsed lung and Edwards died from a single gunshot wound to the back of the head.

Drake told police the car slowed down as it approached. The passenger was leaning out the rear driver's side window. Both the driver and the passenger had handguns and started shooting. They were both Black males in their mid-20s. He testified, however, that he did not see the shooter.

A bystander named Burley heard the shots. He saw a small, older white car, possibly a Honda, going by. A young Black male was hanging out the rear driver's side window, aiming a .22 rifle. Burley did not get a good look at his face and could not see the driver at all.

B. *The Investigation*

At the scene, the police found a total of nine .22-caliber shell casings. They had all been fired from the same gun. The number of rounds indicated the gun was a semiautomatic.

The police also obtained surveillance videos from some of the nearby businesses. These showed a small white car going south on Medical Center, then going north on Medical Center a few minutes later. As it passed the victims, it slowed down. A male was leaning out the rear driver's side window. A "shadowy thing," which could have been the barrel of a rifle, was sticking out the driver's side rear window.

C. *The Informant's First Statement to the Police*

Nearly three months after the shooting, on May 25, 2014, two officers – Officer Sims and Officer Plummer – conducted a traffic stop of a person referred to at trial as John Doe. Officer Plummer had previously used Doe as a paid informant. The officers searched Doe's car and found a gun. Doe then indicated he had information about the shooting. The officers therefore took Doe to the station, where he was interviewed by the lead investigator, Detective William Flesher.

Doe said he was at the intersection and saw the shooting. An older white Kia Sephia that was going south on Medical Center turned around and waited in a parking lot. As the victims were crossing the street, the car drove north, slowly. It stopped in the middle of the street and "just started shooting." Doe heard the shots, looked, and saw more shots fired. He saw Drake run "around the thing," then fall. Edwards turned around but was hit in the head. The surveillance videos, however, did not show Doe at the intersection where he claimed to have been.

Doe identified Venable as the driver and Johnson as the shooter. Johnson was on his knees in the back seat, pointing a .22-caliber rifle "with a long clip" out the window. Venable and Johnson were both members of California Gardens. Drake was a member and Edwards was an associate of the Projects.

After the shooting, Doe communicated with Johnson on Facebook. He said Johnson bragged, "Yeah. I shot him. So what." Johnson soon deactivated his Facebook account. Later, Doe asked Johnson why he did it, and Johnson replied he was "putting in

6

work" for California Gardens. The police obtained Johnson's Facebook records but found nothing bragging about the shooting. A photo of Johnson from his Facebook page showed him with a magazine that could be used in a rifle.

D. *The Informant's Second Statement to the Police*

On June 3, 2015, Detective Flesher interviewed Doe, who said his first statement had been truthful, except about "the proximity." He said he was actually located a block north of the intersection when he heard the shots. Afterwards, though, the car "drove right by [him]." He had "[n]o doubt" that he saw Venable and Johnson.

Doe also said that, while he did see a long gun, only later did someone else tell him it was a .22.

After the shooting, Doe asked Venable — not Johnson — why they did it. Neither of them told him they were putting in work for California Gardens; he inferred that.

Detective Flesher showed Doe "six-pack" photo lineups; once again, Doe identified Venable and Johnson.

E. *The Informant's Statement to a Defense Investigator*

In April 2018, a defense investigator interviewed Doe. Doe told the investigator he did not see the shooting. He claimed the police were forcing him to identify Venable and Johnson; Officer Plummer planted a gun in his car, said it had been used in a murder, and used that as leverage to get him to give a false statement.

According to Doe, Officer Plummer said, "I need you to place yourself at the scene." Officer Plummer also told him that he was going to be shown "six-pack" photo

7

lineups with tiny x's under the photos that he was supposed to identify. Detective Flesher testified there were no x's on the photo lineups.

Doe also told the investigator, however, that "he doesn't want a huge target on his back, his main concern was for his life and safety[.]"

F.  *The Informant's Testimony at the Conditional Examination*

On April 16, 2018, Doe testified at a conditional examination. When asked about his interviews with the police, he said an officer "told [him] to say it or else [he] was going to get charge[d] with murder." He added that Venable and Johnson were being framed.

G.  *The Informant's Testimony at Trial*

At trial, Doe testified he was in protective custody and afraid for his safety.

He was acquainted with the victims. He was aware of Venable, whom he knew as "Trocc," and Johnson, whom he knew as "Mongoo."

On the day of the shooting, Doe was about a block west of the intersection when he saw a white Kia Sephia going south on Medical Center. About 20 to 25 minutes later, he was approximately a block north and slightly west of the intersection. He heard eight or nine "pops" and saw people running. Then the same white car "flew by [him]." In earlier interviews, when he said he was at the intersection, he saw Drake run, and he saw Edwards fall, he "might have been[] kind of[] confused."

Venable was the driver. Johnson was the passenger, sitting in the rear seat on the driver's side. Johnson was just pulling a rifle "back inside in the window." The rifle was a .22, with a clip.

Johnson did not tell Doe directly that he did the shooting to "put in work" for California Gardens. Rather, Doe saw a female receive Facebook messages from Johnson saying that "they" did the shooting.

Doe repeated his allegation that, after Officer Sims stopped and searched his car, Officer Plummer planted a gun in it; Officer Plummer then said he was going to charge Doe with a murder that had been committed with the gun, unless he provided certain information. Doe pleaded guilty to unlawful possession of the gun and was sentenced to two years in prison.

Later, Doe was charged with felony evading. He entered a plea bargain that required him to testify truthfully in this case in exchange for a "favorable disposition" in that case. He said his statement to the defense investigator was a lie.

H. *Gang Evidence*

It was stipulated that both California Gardens and Projects are "criminal street gangs." This included a stipulation that the Gardens' primary activities included murder, attempted murder, possession of controlled substances for sale, assaults with firearms, unlawful possession of firearms, carjackings, robberies and burglaries. It also included a stipulation that Gardens members had been convicted of five predicate offenses. Finally, it was stipulated that Venable and Johnson were members of Gardens.

9

Officer Sims testified as a gang expert for the prosecution. He explained California Gardens and Projects are rivals, and the shooting occurred in Projects' territory. Victims Drake and Edwards were either Projects members or associates.

In the expert's opinion, Johnson committed the shooting to get back in good standing with California Gardens. He had been in "bad standing"; in fact, a high-ranking member of the gang had shot him. After the charged shooting, however, Johnson was back in good standing. The gang expert opined, in hypothetical form, that the shooting was committed at the direction of, for the benefit of, and in association with the gang.

I. *The Rap Video*

On YouTube, the police found a rap video featuring Venable's younger brother, "Young Trocc." Venable and other California Gardens members were also in the video. They could be seen flashing gang signs and displayed guns, drugs, and money. At one point, Venable held a rifle with an extended magazine.

One of the lines in the rap was: "Got word from a bird[] that they did that [racial slur] dead wrong/Slid up Medical and left that [racial slur] head gone." According to the gang expert, this meant Venable's brother had heard a California Gardens member shot someone else in the head on Medical Center. He said until the charged shooting, no one had been shot in the head on Medical Center since 2007.

In the expert's opinion, the video was a way of "claiming ownership" of the shooting and bragging about it. He conceded it was the gang as a whole taking credit, and not any particular member of the gang.

10

J.  *Defense Evidence.*

Venable lived with his aunt. She testified Venable was at home all day when the shooting occurred. She remembered because he was arrested for an unrelated probation violation on the same day. She previously told the police she didn't remember what Venable had done that day, but she didn't think he was there the whole day.

Venable testified on his own behalf. At first — despite his stipulation — he denied being a member of California Gardens. However, after being confronted with his own prior admissions, to the police and others, he admitted he was a member.

He denied being present at the shooting. He had never met Johnson until they were both arrested. He said he participated in the rap video to support his brother. In it, he was just "portraying an image." The guns in the video were props, not real guns.

After the shooting, the police asked Venable if he had ever been in a white Kia. He said he had not. However, when they pointed out that in 2009, he had been stopped while in a white Kia, he said he used to drive his girlfriend's white Kia.

K.  *Prosecution Rebuttal*

Officer Plummer denied planting a gun in Doe's car. Both Officer Plummer and Officer Sims testified that neither of them ever threatened Doe. Officer Plummer denied making any promises to Doe or telling him what to say.

# II

# ANALYSIS

A. *New Evidence Code Section 352.2*

Last year, the Legislature passed and the governor signed AB 2799, which adds section 352.2 to the Evidence Code. The new law took effect January 1, 2023. The relevant portion of Evidence Code section 352.2 provides:

"(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings.

"(b) If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental

or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony." (Evid. Code, § 352.2, as added by Stats. 2022, ch. 973, § 2, eff. Jan. 1, 2023.)

The Legislature made this change to address the problem of introducing racial stereotypes and bias into criminal proceedings by allowing rap lyrics into evidence. "[A] substantial body of research shows a significant risk of unfair prejudice when rap lyrics are introduced into evidence." (Stats. 2022, ch 973, § 1.) As noted in the comments to the Assembly floor analysis, "rap lyrics and other creative expressions get used as 'racialized character evidence: details or personal traits prosecutors use in insidious ways playing up racial stereotypes to imply guilt.' The resulting message is that the defendant is that type of Black (or Brown) person. . . . 'There's always this bias that this young Black man, if they're rapping, they must only be saying what's autobiographical and true, because they can't possibly be creative.'" (AB 2799, Assem. Floor Analysis at p. 3, quoting Erik Nielson & Andrea L. Dennis, *Rap on Trial: Race, Lyrics, & Guilt in America* (The New Press 2019).)[3]

To address the problem, the Legislature announced their intent "to provide a framework by which courts can ensure that the use of an accused person's creative expression will not be used to introduce stereotypes or activate bias against the defendant,

---

[3] The Assembly Floor Analysis is available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB2799.

nor as character or propensity evidence; and to recognize that the use of rap lyrics and other creative expression as circumstantial evidence of motive or intent is not a sufficient justification to overcome substantial evidence that the introduction of rap lyrics creates a substantial risk of unfair prejudice." (Stats. 2022, ch. 973, § 1.)

Before now—including at the time of Venable's trial—rap lyrics were generally deemed admissible so long as they were relevant and not so unduly prejudicial or confusing as to require exclusion under Evidence Code section 352. (E.g., *People v. Zepeda* (2008) 167 Cal.App.4th 25, 34-35.) The new section 352.2 now requires a trial judge to consider in addition that the probative value of such evidence is minimal absent certain markers of truth and that undue prejudice includes the possibility the evidence will inject racial bias and be used to improperly indicate the defendant's propensity for violence. (Evid. Code, § 352.2, subd. (a).) These changes make it more likely that rap lyric evidence will be excluded, which creates a potential benefit to defendants in that the results of some criminal proceedings will be more favorable to the accused.

There's no question the trial judge's admission of the rap evidence in this case did not comply with the new requirements for admission of creative expression. There's also substantial concern that admitting the evidence may have had the precise effects the Legislature sought to avoid. The rap video contains offensive language, including frequent uses of the n-word, depictions of guns and drugs, and references to violent gang activities. Most of the people who appear in the video are young Black men. Venable appeared in the video, but he didn't say anything. Most of the lyrics had nothing to do

14

with the shooting in this case, though one line could be interpreted as referring to the shooting. "Got word from a bird that they did that [racial slur] dead wrong. Slid up Medical and left that [racial slur]'s head gone." Nothing in the song indicates the rapper or others in the video had personal knowledge or involvement in the shooting, only that they had heard about it. The prosecution nevertheless placed a lot of emphasis on the video. They played it twice during their case-in-chief and a third time during closing arguments. In closing, the prosecutor argued, "There he is [Venable]. There he is. They kill them on-scene. They kill. Slid up Medical, left that [racial slur]'s head gone. That's our victim's murder. There he is. There he is [Venable]. There he is."

B. *Retroactive Application*

We conclude Evidence Code section 352.2 is ameliorative and therefore applies to cases that are not yet final. (*Estrada*, *supra*, 63 Cal.2d 740.)

Evidence Code section 352.2 provides defendants of color charged with gang related crimes an ameliorative benefit, specifically, a trial conducted without evidence that introduces bias and prejudice into the proceedings, limitations designed to increase the likelihood of acquittals and reduce punishment for an identified class of persons. Under recent California Supreme Court precedent developing the *Estrada* rule, that means the Legislature intended the new provision to apply retroactively to the cases of defendants, like Venable, whose cases are not yet final. (*People v. Frahs* (2020) 9 Cal.5th 618, 627-628 *(Frahs)*.)

In *Frahs*, the Supreme Court explained " '[t]he *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*Frahs*, *supra*, 9 Cal.5th at p. 628.) The question we face is whether the new evidence rule is ameliorative. The People argue it is not because the rule change has to do with the introduction of evidence and doesn't directly reduce punishment. While that characterization is undoubtedly true, it doesn't end the matter, and is inconsistent with how the *Estrada* rule has developed.

In *Frahs*, the Supreme Court considered the retroactive application of new provisions which gave trial courts the discretion to grant pretrial diversion for defendants with mental health disorders. (*Frahs*, *supra*, 9 Cal.5th at pp. 624, 626.) That change was procedural and, like the new evidence rule in this case, didn't directly reduce punishment. But the Supreme Court dug deeper. In considering whether the new law was ameliorative under *Estrada,* they emphasized "by design and function [the change] *provides a possible ameliorating benefit for a class of persons*—namely, certain defendants with mental disorders—by offering an opportunity for diversion and ultimately the dismissal of charges." (*Frahs*, at p. 624, italics added.) They also emphasized the new procedures "carry the *potential* of substantial reductions in punishment." (*Id.* at p. 631, italics added.) On those grounds, they concluded the legislative changes were ameliorative and applied

retroactively to nonfinal cases even though they did not directly or necessarily affect punishment. (*Id.* at pp. 631-632.)

The Supreme Court reached a similar conclusion in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308. There, the Court considered the retroactivity of Proposition 57, which changed the law to prohibit prosecutors from filing charges directly against a minor in an adult criminal case and to give juvenile courts discretion to determine whether a minor can be prosecuted and sentenced as an adult. (*Lara*, at p. 308.) In *Lara*, the Court acknowledged Proposition 57 did not mitigate punishment for any particular crime but held the *Estrada* rule applies because the new law "reduces the possible punishment" for juveniles. (*Lara*, at p. 303.) The Court emphasized "[t]he *possibility* of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Ibid*, italics added.) The effect of the change was to increase the likelihood of a lesser sentence for a class of defendants, making the new provision ameliorative and the *Estrada* rule apply.

Also persuasive is the majority opinion in *People v. Burgos*, which concluded Penal Code section 1109 (Stats. 2021, ch. 699, § 5 in Assem. Bill No. 333 (2021-2022 Reg. Sess.)) is an ameliorative statute. Assembly Bill No. 333 created Penal Code section 1109 to require the automatic bifurcation of trials involving gang enhancements if requested by the defendant. (Pen. Code, § 1109, subd. (a).) The *Burgos* majority concluded this change, while procedural, is nevertheless ameliorative because bifurcation

increases the possibility of acquittal, "which necessarily reduces possible punishment." (*People v. Burgos* (2022) 77 Cal.App.5th 550, 567, review granted Jul. 13, 2022, S274743 (*Burgos*).) The *Burgos* majority marshaled evidence from the legislative findings for the law which showed the Legislature's purpose in including Penal Code section 1109 was specifically to reduce punishment. " 'Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact.' " (*Burgos*, at p. 566, quoting Assem. Bill No. 333, § 2, subd. (f).) The findings also noted bifurcation is intended to mitigate the possibility of wrongful convictions and pressure on defendants to accept unfavorable plea deals " 'rather than risk a trial filled with prejudicial evidence and a substantially longer sentence.' " (*Burgos*, at p. 567.) As such, they concluded *Frahs* teaches Penal Code section 1109 should apply retroactively to nonfinal cases because it "provides a possible ameliorating benefit for a class of persons." (*Frahs*, *supra*, 9 Cal.5th at p. 624.)

Penal Code section 1109 is similar in its purpose and effect to Evidence Code section 352.2. Section 1109 gives defendants the right to request a bifurcated trial free of otherwise irrelevant and prejudicial gang enhancement evidence. (*Ibid.*; see also *Burgos*, *supra*, 77 Cal.App.5th at p. 567.) It is ameliorative because it carries "the potential of substantial reductions in punishment for the [defendants]" and provides the benefit of bifurcated trials free from prejudicial gang enhancement evidence. (*Frahs*, *supra*, 9 Cal.5th at p. 631; *Lara*, *supra*, 4 Cal.5th at pp. 308-309.) As the Court of Appeal wrote in *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129, "by its plain language, Assembly

18

Bill 333 is an ameliorative change to the criminal law intended to benefit a class of criminal defendants by reducing the potential harmful and prejudicial impact of gang evidence through bifurcation." Since "[t]he legislation is geared to address wrongful convictions and mitigate punishment resulting from the admission of irrelevant gang evidence at trial . . . the logic of *Estrada* applies." (*Ibid.*) The same is true of Evidence Code section 352.2.

C. *Prejudice*

For the reasons discussed above, we conclude the admission of the rap video without the new safeguards was prejudicial to Venable. There is substantial doubt whether the trial judge would have admitted the video evidence under the new standard, and it's clear the prosecution used that evidence to tie Venable to the specific crime.

The remaining evidence of Venable's involvement was not strong. The only witness who identified him as being involved was Doe, a police informant who gave a series of conflicting accounts of the incident and had testified Venable was being framed. Meanwhile, Venable's aunt provided an alibi for him, and Venable testified he was not involved in the shooting. The prosecution's emphasis of the rap video at various points in the trial, including in closing arguments, likely had an effect on the outcome.

Under these circumstances, and with the understanding that the Legislature intended Evidence Code section 352.2 to apply to nonfinal cases, we reverse Venable's conviction and remand for retrial. Because our conclusion moots the other points Venable raised on appeal, we do not address them.

19

# III

# DISPOSITION

We reverse the judgment and remand for a new trial.

CERTIFIED FOR PUBLICATION

SLOUGH
                                                                    J.

We concur:

RAMIREZ
              P. J.

MENETREZ
              J.